Filed 4/12/21  P. v. Smith CA6
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H046537 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C1651226) |
| v. | ORDER MODIFYING OPINION NO CHANGE IN JUDGMENT |
| JOSEPH JERMANE SMITH, | |
| Defendant and Appellant. | |

BY THE COURT:

On the court's own motion (Cal. Rules of Court, rule 8.264(c)), it is ordered that the opinion filed herein on April 9, 2021, be modified as follows:

On page 25, the footnote on the signature, replace "Santa Clara County" with "Santa Cruz County."

There is no change in the judgment.

Dated: _____

_____
Cogliati, J.[*]

_____
Greenwood, P.J.

_____
Elia, J.

People v. Smith
H046537

_____

[*] Judge of the Santa Cruz County Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>JOSEPH JERMANE SMITH,<br><br>        Defendant and Appellant. | H046537<br>(Santa Clara County<br>Super. Ct. No. C1651226) |

Defendant Joseph Jermane Smith appeals after a jury convicted him of committing a lewd act on a child under the age of 14 by means of force, violence, duress, menace, or fear (count 1; Pen. Code, § 288, subd. (b)(1)[1]) and an aggravated sexual assault on a child under the age of 14 and 10 or more years younger than himself (count 2; § 269).  The trial court imposed an indeterminate prison term of 15 years to life for count 2 and stayed the term for count 1 pursuant to section 654.

On appeal, defendant contends there was insufficient evidence that he used force, violence, duress, menace, or fear in the commission of counts 1 and 2.  He also contends the trial court erred by admitting the victim's prior statement under the fresh complaint doctrine, permitting the prosecution to call a live witness to provide evidence relating to a prior uncharged act, and admitting evidence of Child Abuse Accommodation Syndrome (CSAAS).  Defendant challenges CALCRIM No. 1193, which tells the jury how to

---

[1] Unspecified section references are to the Penal Code.

consider CSAAS evidence, and he contends the trial court erroneously imposed a $200 restitution fine and $120 in fees without finding defendant had an ability to pay.

We find substantial evidence supports both of defendant's convictions. We find no error in the challenged evidentiary rulings or the challenged jury instruction. We find that any error in failing to hold a hearing on defendant's ability to pay the fine and fees was harmless. We will therefore affirm the judgment.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

### A.     *S. Doe's Testimony*

S. Doe was 22 years old at the time she testified at defendant's trial in July 2018. Two years earlier, in July 2016, Doe had called the police and reported that defendant had sexually assaulted her when she was five years old, which was in 2001. Doe believed defendant was about 18 or 20 years old at the time of the sexual assault.[2] Doe was unsure if defendant was her cousin or her half-brother; she had learned that defendant's father, Joseph Smith, Sr., was "possibly" her father.

The sexual assault had occurred when Doe's family was moving from her great grandmother's house in San Jose to an apartment. At the time, Doe knew that defendant "was family." She knew that defendant's father was the brother of her aunt, who lived in "the back house" at the same property.

On the day of the sexual assault, Doe's adult family members, including defendant, were helping with the move. Some of the adults left with a U-Haul truck. Defendant, however, stayed at the house with Doe.

---

[2] Defendant was born in October 1981, so he would have been 19 years old for most of the year 2001.

Defendant told Doe to go up to the attic to finish packing; she did.[3] Defendant came up to the attic after the U-Haul truck left. Defendant had a "blank face, serious" look.

Defendant told Doe to lie down, so she lay down on the floor. Either "before or after," defendant told Doe "not to tell anybody." Defendant pulled down Doe's shorts or pants, and he pulled down his own pants while kneeling above her. Defendant may have said, "It won't hurt." Defendant then inserted his penis into Doe's vagina.

Doe did not cry or scream; she was not in pain. She did not "know what was happening" and was scared that something would happen to her if she told anyone. Defendant stopped when the U-Haul truck returned.

Doe did not see defendant again until she was in sixth grade. Doe's mother had asked defendant to drive Doe and her brother to school. By that time, Doe had realized that what had happened "was wrong." Doe told her mother she did not want to go with defendant, but she did not give a reason, and her mother insisted.

In 2008, when Doe was 12 years old, she moved to Fresno. After the move, she told her mother about the sexual assault. Doe had been "caught dry humping" the son of her mother's friend. Doe's mother kept asking questions, "trying to figure out" why Doe was "doing that." Doe's mother said that a "similar" thing had happened to her with defendant's father. Doe's mother also said it was "too late" for Doe to report the sexual assault.

In 2015, Doe confronted defendant's father about possibly being her own father. Doe asked for a DNA test, but defendant's father refused.

In July 2016, Doe attended a family reunion at a park in San Jose. A few days later, she had a conversation with her aunt, during which she disclosed the sexual assault.

---

[3] The house had a permitted "loft" with an eight-foot ceiling.

Doe was hoping her aunt would help her get a DNA test. The aunt told Doe that it was not too late for her to file a police report.

Just before calling the police, Doe found out that defendant was facing child sexual assault charges in another case. Doe did not know the victim in that case.

Doe admitted that she had advertised herself on the Internet for "prostitution services." She testified under a grant of use immunity: her testimony regarding her prostitution-related activities could not be used in any criminal prosecution against her.

**B.     *CSAAS Evidence***

Psychologist Anthony Urquiza testified as an expert regarding Child Sexual Abuse Accommodation Syndrome (CSAAS). He explained that CSAAS "is used to educate people" about "the context of sexual abuse, what happens to kids who have been sexually abused, and to dispel any misperceptions or myths" about child sexual abuse. CSAAS "should not be used to make a determination as to whether somebody was abused or not."

CSAAS has five "categories," or common characteristics of child sexual abuse: secrecy, helplessness, entrapment and accommodation, delayed and unconvincing disclosure, and retraction or recantation.

Secrecy explains why children keep sexual abuse a secret. A child may keep the abuse a secret because the abuser has threatened the child or because the abuser has authority or power over the child. The child may keep silent because the abuser provided the child with attention, affection, or gifts. Additionally, the child may keep the abuse secret because he or she feels embarrassment or shame.

Helplessness refers to the "inherent vulnerability" of children who are sexually abused by someone "bigger, older, and stronger than them" and "in a position of power, authority," with "access to them." In other words, such children have few options for preventing the sexual abuse.

4

Entrapment and accommodation explains how children who are being sexually abused deal with their feelings of shame, humiliation, fear, trauma, and disgust. Such children often disassociate, shut down, and suppress their emotions.

Delayed and unconvincing disclosure refers to the fact that "most children do not tell right away" and the fact that the disclosure may be gradual. It may take months or years for a child to disclose sexual abuse. If a child receives a negative reaction to his or her initial disclosure, that can cause the child to further delay a full disclosure.

Retraction and recantation describes how a child may "take back" an allegation of sexual abuse after an initial disclosure. Often the retraction is due to pressure from a family member.

### C. *Anabella Doe Incident*

In 2013, defendant was convicted of having committed a lewd act (§ 288, subd. (a)) on Anabella Doe in October 2010. Anabella Doe testified that she was born in May 2005 and that she was 13 years old at the time of trial.

### D. *Verdicts and Sentence*

A jury convicted defendant of committing a lewd act on a child under the age of 14 by means of force, violence, duress, menace, or fear (count 1; § 288, subd. (b)(1)) and of committing an aggravated sexual assault on a child under the age of 14 and 10 or more years younger than defendant (count 2; § 269) by means of forcible rape (§ 261, subd. (a)(2)). The trial court imposed an indeterminate prison term of 15 years to life for count 2 and stayed the term for count 1 pursuant to section 654.

## II.    DISCUSSION

### A.    *Sufficiency of the Evidence*

Defendant contends there was insufficient evidence that he used force, violence, duress, menace, or fear in the commission of counts 1 and 2.[4]  Defendant points out that Doe did not try to push him away, that he did not threaten Doe with weapons, and that he did not perform a physical act such as choking Doe or pinning her down.  Defendant also asserts that he made no express threat of retribution and that there was no evidence he had authority over Doe.

#### 1.    *Standard of Review*

When considering a challenge to the sufficiency of the evidence to support a criminal conviction, we "review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt."  (*People v. Johnson* (1980) 26 Cal.3d 557, 578; see also *Jackson v. Virginia* (1979) 443 U.S. 307, 319-320.)  "In making this determination, we do not reweigh the evidence, resolve conflicts in the evidence, or reevaluate the credibility of witnesses."  (*People v. Cortes* (1999) 71 Cal.App.4th 62, 71.)

#### 2.    *Count 1 – Forcible Lewd Act*

At trial, the prosecutor argued that defendant used force and duress to accomplish the lewd act.  With respect to force, the prosecutor argued that the penetration of Doe's vagina, and the pulling down of Doe's pants or shorts, involved force beyond what was necessary to accomplish a lewd touching, which could be accomplished over clothing.

---

[4] Defendant moved for dismissal of count 1 at the close of the prosecution's case on the ground that there was insufficient evidence of force or duress.  (See § 1118.1.)  In argument to the jury, defendant argued that he had not committed any sexual act.

6

With respect to duress, the prosecutor pointed out that Doe was five years old, that defendant had a serious look on his face, and that defendant told her to lie down and not tell anyone.

For purposes of section 288, subdivision (b)(1), "force" means " 'physical force that is " 'substantially different from or substantially greater than that necessary to accomplish the lewd act itself.' " ' " (*People v. Jimenez* (2019) 35 Cal.App.5th 373, 391.)

"[D]uress," as used in section 288, subdivision (b)(1), means " 'a direct or implied threat of force, violence, danger, hardship or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to (1) perform an act which otherwise would not have been performed or, (2) acquiesce in an act to which one otherwise would not have submitted.' " (*People v. Leal* (2004) 33 Cal.4th 999, 1004 (*Leal*), italics omitted.)

Factors relevant to a finding of duress include "the victim's age, her relationship to the perpetrator, threats to harm the victim, physically controlling the victim when the victim attempts to resist, warnings to the victim that revealing the molestation would result in jeopardizing the family, and the relative physical vulnerability of the child. [Citations.] The fact that the victim testifies the defendant did not use force or threats does not preclude a finding of duress." (*People v. Thomas* (2017) 15 Cal.App.5th 1063, 1072 (*Thomas*).)

We need not reach the question of whether there was sufficient evidence of force in this case, because there was substantial evidence to support a finding of duress. Doe was five years old and about 15 years younger than defendant, who was an adult family member. There was a significant size disparity between Doe and defendant. Defendant was an apparent authority figure to Doe: he was an adult family member who remained at the house with Doe after other adults left, and he gave Doe instructions to go to the attic to finish packing. Defendant's apparent authority was reinforced by his "blank face,

7

serious" look and his further instruction that she was to lie down. Moreover, by isolating Doe in the attic, defendant made her even more vulnerable. (See *People v. Superior Court* (*Kneip*) (1990) 219 Cal.App.3d 235, 238 [duress found where molestation "took place in an isolated room out of the presence of other adults"].) Together, a reasonable jury could find that these facts constituted an " 'implied threat of force, violence, danger, hardship or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to (1) perform an act which otherwise would not have been performed or, (2) acquiesce in an act to which one otherwise would not have submitted.' " (*Leal*, *supra*, 33 Cal.4th at p. 1004, italics omitted.)

3.    *Count 2 – Aggravated Sexual Assault* (*Rape*)

At trial, the prosecutor argued that defendant had used force and duress to commit the rape, which was the basis for the aggravated sexual assault count.

Again, we need not reach the question of whether defendant accomplished the sexual assault by force, because the record contains substantial evidence supporting a finding that he used duress. The definition of duress in the rape statute (§ 261, subd. (b)) is slightly different than the definition of duress applied to section 288, subdivision (b), in that a threat of hardship will not constitute duress for purposes of rape. (See *Leal*, *supra*, 33 Cal.4th at p. 1008.) However, the same factors are relevant to a determination of whether a defendant used duress to commit an aggravated sexual assault of a child based on an allegation of rape. (See *Thomas*, *supra*, 15 Cal.App.5th at p. 1072.) Our analysis is therefore the same as it was for count 1: based on the age disparity, the size disparity, defendant's status as an adult family member who was an apparent authority figure to Doe, and defendant's isolation of Doe, a reasonable jury could find that defendant accomplished the aggravated sexual assault by means of duress.

8

**_B_.     _Fresh Complaint Evidence_**

Defendant contends the trial court erred by admitting Doe's statements to her mother and aunt under the fresh complaint doctrine. He argues that the delay of approximately seven years cannot be "considered 'fresh.' " He also asserts that the fresh complaint doctrine should not allow evidence of a complaint made in response to "pressure" or "questioning." Defendant further argues that the trial court should have excluded Doe's initial complaint to her mother under Evidence Code section 352 because it had "no probative value" in light of the passage of time and circumstances of the disclosure.

_1.     Proceedings Below_

The People filed a motion in limine seeking to admit Doe's prior disclosures under the fresh complaint doctrine. Defendant opposed the admission of Doe's disclosures, pointing out that the disclosure to her mother was made seven years after the alleged sexual assault and arguing that the disclosure was unreliable because it was made in response to questioning. Defendant further argued that the fresh complaint evidence was "highly prejudicial" and should be excluded under Evidence Code section 352.

The trial court held an Evidence Code section 402 hearing to consider the circumstances of Doe's prior disclosures.

At the hearing, Doe testified that she had lived in San Jose until 2008, when she was 12 years old and moved to Fresno with her mother and brothers. "[A] little bit after" they moved, Doe told her mother what defendant had done. Doe had "gotten in trouble" that day for being "sexually inappropriate" with a boy: her mother had caught them "dry humping." Doe's mother had asked how Doe knew "those things" and why she was doing them. Doe's mother's asked whether Doe had any prior sexual experiences. Afraid to "get grounded" and "get a whopping" if she did not tell her mother why she had been "acting sexually," Doe told her mother that defendant had raped her when she was

9

five years old, in the attic of the San Jose house, when the family had left with the U-Haul truck. Doe's mother "broke down" and said that she had been raped, too.

Doe also testified about the 2016 disclosure to her aunt. In 2014, Doe had discovered that defendant's father was also likely her own father. At a family gathering in 2016, a relative had confronted Doe's mother about defendant's father. A few days later, Doe told her aunt that she wanted a DNA test to confirm that defendant's father was her own father, because she wanted to know if the person who had raped her was a cousin or a brother. When Doe explained that her mother had told her "it was too late" to report the crime, her aunt told her that it was not too late to file a police report.

After Doe's testimony at the hearing, defendant argued that the trial court should not admit the disclosures under the fresh complaint doctrine. He argued that Doe's disclosure to her mother was made seven years after the incident, "under extreme duress," and in response to "suggestive and leading questions." He argued that Doe's disclosure to her aunt had occurred 15 years after the incident and that it was made under "pressure."

The prosecutor argued that Doe's disclosure to her mother was "volunteered" in that she had mentioned defendant "on her own." Likewise, he argued, Doe had volunteered the information to her aunt.

The trial court found that Doe's disclosure to her mother was not made in "response to an interrogation" about whether Doe had been raped or molested, and therefore it would be admitted. The trial court further found that Doe's disclosure to her aunt was "offered up" voluntarily and thus that it, too, would be admitted.

The jury was instructed on the fresh complaint evidence as follows: "Evidence was received that on an occasion outside of court, the alleged victim made a complaint of sexual misconduct relating to the charges. [¶] You may consider such evidence solely for

10

the purpose . . . that a complaint was made and not as proof of the truth of the content of the alleged victim's complaint."

    2.    *Legal Principles*

The parameters of the fresh complaint doctrine were set forth in *People v. Brown* (1994) 8 Cal.4th 746 (*Brown*): "[P]roof of an extrajudicial complaint, made by the victim of a sexual offense, disclosing the alleged assault, may be admissible for a limited, nonhearsay purpose—namely, to establish the fact of, and the circumstances surrounding, the victim's disclosure of the assault to others—whenever the fact that the disclosure was made and the circumstances under which it was made are relevant to the trier of fact's determination as to whether the offense occurred.  Under such generally applicable evidentiary rules, the timing of a complaint (e.g., whether it was made promptly after the incident or, rather, at a later date) and the circumstances under which it was made (e.g., whether it was volunteered spontaneously or, instead, was made only in response to the inquiry of another person) are not necessarily determinative of the admissibility of evidence of the complaint.  Thus, the 'freshness' of a complaint, and the 'volunteered' nature of the complaint, should not be viewed as essential prerequisites to the admissibility of such evidence."  (*Id.* at pp. 749-750.)

"[S]o long as the evidence in question is admitted for the nonhearsay purpose of establishing the circumstances under which the victim reported the offense to others, such evidence ordinarily would be relevant under generally applicable rules of evidence, and therefore admissible, so long as its probative value outweighs its prejudicial effect. (Evid. Code, § 352.)"  (*Brown*, *supra*, 8 Cal.4th at pp. 759-760, italics omitted.)  The evidence admitted should be "carefully limited to the fact that a complaint was made, and to the circumstances surrounding the making of the complaint, thereby eliminating or at least minimizing the risk that the jury will rely upon the evidence for an inadmissible hearsay purpose."  (*Id.* at p. 762.)

11

We apply the abuse of discretion standard of review to "any ruling by a trial court on the admissibility of evidence." (*People v. Waidla* (2000) 22 Cal.4th 690, 724 (*Waidla*).)

### 3.    *Analysis*

The defendant in *Brown* made the same arguments that defendant presents in this case: that evidence of the victim's out-of-court statements was not admissible under the fresh complaint doctrine because the victim "did not voice the complaint promptly, and, when she ultimately did report the incidents, made the complaint only in response to questioning by an adult friend." (*Brown*, *supra*, 8 Cal.4th at p. 749.)

In *Brown*, the sexual abuse began when the victim was seven years old and continued until she was 12 years old. (*Brown*, *supra*, 8 Cal.4th at pp. 750-751.) The victim disclosed the abuse to an adult about two or three months after the last incident. (*Id*. at p. 752.) The adult had " 'sort of pried it out' " (*ibid*.) of the victim, who was " 'reluctant' " to disclose the abuse (*id.* at p. 753).

The *Brown* court noted that prior case law had developed the rule that a complaint of sexual abuse "must have been truly 'fresh' or 'recent' " in order to be admissible. (*Brown*, *supra*, 8 Cal.4th at p. 756.) But the court recognized that "one of the historic premises of the doctrine—that it is natural for the victim of a sexual assault to complain promptly following the assault—has been discredited substantially in contemporary times." (*Id*. at p. 758.) Even a delayed disclosure can be "relevant to the jury's evaluation of the likelihood that the offense did or did not occur." (*Id*. at p. 761.) Without knowing the circumstances under which the victim first reports the commission of an alleged offense, the jury "may be left with an incomplete or inaccurate view of all the pertinent facts." (*Ibid*.) Admitting "the circumstances surrounding a delayed complaint, including those that might shed light upon the reason for the delay, will reduce the risk that the jury, perhaps influenced by outmoded myths regarding the 'usual' or

12

'natural' response of victims of sexual offenses, will arrive at an erroneous conclusion with regard to whether the offense occurred." (*Brown*, *supra*, at pp. 761-762.)

Ultimately, the *Brown* court rejected the defendant's arguments, holding that "the admissibility of such evidence does not turn invariably upon whether the victim's complaint was made immediately following the alleged assault or was preceded by some delay, nor upon whether the complaint was volunteered spontaneously by the victim or instead was prompted by some inquiry or questioning from another person." (*Brown*, *supra*, 8 Cal.4th at p. 763.) The question is whether the statements are relevant and, if so, whether their probative value is "outweighed by the risk that the jury will consider it for impermissible hearsay purposes, or that the evidence will otherwise create a danger of undue prejudice or will mislead or confuse the jury." (*Ibid*.; see Evid. Code, § 352.)

In the instant case, the evidence of Doe's disclosures to her mother and her aunt was "relevant to the jury's determination of whether the alleged molestation did or did not occur." (*Brown*, *supra*, 8 Cal.4th at p. 763.) The circumstances under which Doe made the disclosures were probative of that determination. The first disclosure occurred after Doe had been caught engaging in inappropriate sexual behavior, in response to her mother's demand for an explanation. The second disclosure occurred when Doe sought out her aunt's assistance in determining whether defendant's father was Doe's own father. When Doe made the first disclosure, she was told it was too late to report the sexual assault. But when Doe made the second disclosure, it led to her calling the police. The circumstances of both disclosures helped "shed light" on why Doe made the disclosures "as well as the reasons for her substantial delay in doing so." (*Id*. at p. 764.) The circumstances of the disclosures also "tended to forestall any erroneous inferences that might have arisen in the absence of that evidence." (*Ibid*.)

The evidence of Doe's disclosures "fell within the limits appropriately governing the admissibility of such statements." (*Brown*, *supra*, 8 Cal.4th at p. 764.) "[T]he

13

testimony was limited to the timing of [the] complaint[s] and the circumstances under which [they were] made, omitting the content of the statements and specifically any description of the molestation itself." (*Ibid*.)

We also find no abuse of discretion under Evidence Code section 352, because the probative value of the fresh complaint evidence was not "outweighed by the risk that the jury [would] consider it for impermissible hearsay purposes" (*Brown*, *supra*, 8 Cal.4th at p. 763), nor was it "substantially outweighed by the probability that its admission [would] (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

The fresh complaint evidence in this case was brief and did not include any details of the sexual assault. The fact that Doe made prior complaints was probative of Doe's credibility in eventually reporting the sexual assault to the police in 2016. On this record, the trial court did not abuse its discretion by declining to exclude the fresh complaint evidence pursuant to Evidence Code section 352.

*C*. **Anabella Doe's Testimony**

Defendant contends the trial court erred by permitting the prosecution to call Anabella Doe as a live witness for the purpose of establishing that Anabella had been five years old when defendant molested her. Defendant points out that he was willing to stipulate to admission of the conviction records, which included the fact that Anabella Doe was five years old at the time of the crime, and he contends the trial court's ruling violated Evidence Code section 352.

*1.* *Proceedings Below*

Defendant's motions in limine included a motion to exclude evidence of his 2010 sexual offense involving Anabella Doe, pursuant to Evidence Code section 352. Defendant acknowledged he had been convicted of violating section 288, subdivision (a)

but argued that the incident was remote in time and that presenting evidence of the offense would involve an undue consumption of time and confuse the jury.

The People filed a motion in limine seeking to admit evidence of the Anabella Doe incident pursuant to Evidence Code sections 1101 and 1108. The People asserted that the victims were "almost exactly the same age," that the conduct involving Anabella Doe was "less inflammatory" because it involved oral copulation instead of rape, and that the prior incident was not remote in time. The People further argued that not only were certified documents showing defendant's conviction admissible, but that evidence of the underlying offense was also admissible.

During the hearing on motions in limine, the trial court ruled that "the prior" would be admitted. At trial, a certified copy of defendant's conviction was admitted into evidence. Defendant's trial counsel subsequently requested that the exhibit be redacted to remove a reference to Anabella Doe's age. He argued that the record of conviction "should only include facts and circumstances that were actually found beyond a reasonable doubt by a jury in that matter," and he pointed out that the jury only had to find that Anabella Doe was under the age of 14.

The prosecutor offered to call Anabella Doe as a witness to testify as to her age at the time of the prior offense. Defendant objected that if Anabella Doe was called as a witness, her own testimony about her age would be hearsay because she would have "no personal memory or knowledge of the day that she was born." The trial court indicated it could redact the exhibit and take judicial notice of court records showing Anabella Doe's age, or it could leave her age in the exhibit.

Ultimately, defendant withdrew his objection to the exhibit and objected instead to Anabella Doe being brought in as a live witness, asserting that it would be "unduly prejudicial," involve an "undue consumption of time," and be "duplicative." Defendant noted that Anabella Doe was "a little distraught" as she waited in the witness room.

15

The prosecutor indicated he would only ask Anabella Doe her birthdate, then excuse her. He would then present the officer who had investigated both of defendant's cases and show some still photographs from a 2010 interview of Anabella Doe, when she was five years old. The trial court ruled that the prosecutor could not present the photographs, but that the live testimony of Anabella Doe would be permitted.

When Anabella Doe took the stand, she was accompanied by her grandmother, as a support person. She was asked her name, her age, and her birthday. Her testimony took up less than one page of the reporter's transcript.

2. *Legal Principles*

Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." Evidence is substantially more prejudicial than probative "if, broadly stated, it poses an intolerable 'risk to the fairness of the proceedings or the reliability of the outcome.' " (*Waidla*, *supra*, 22 Cal.4th at p. 724.) As noted above, we apply the abuse of discretion standard of review to "any ruling by a trial court on the admissibility of evidence." (*Ibid.*)

3. *Analysis*

Defendant first contends Anabella Doe's testimony was cumulative of other evidence—the record of his prior conviction, which established her age at the time of that offense—and thus that her testimony consumed an undue amount of time. As noted above, however, Anabella Doe's testimony was extremely brief and limited. Although her testimony added little to the prosecution's case, the trial court's ruling permitting the testimony was well within its discretion, particularly after the defense had raised an objection to the statement of Annabella's age in the record of conviction.

16

Defendant further notes that Anabella Doe was distraught prior to her testimony, and he posits that she remained "extremely upset when she testified," such that any probative value of her testimony was substantially outweighed by its potential for prejudice. "Evidence is prejudicial within the meaning of Evidence Code section 352 if it ' "uniquely tends to evoke an emotional bias against a party as an individual" ' [citations] or if it would cause the jury to ' " 'prejudg[e]' a person or cause on the basis of extraneous factors." ' " (*People v. Cowan* (2010) 50 Cal.4th 401, 475.)

Although the record shows that Anabella Doe was "a little distraught" as she waited in the witness room, nothing indicates that she was upset when she testified in front of the jury, such that her testimony would evoke an emotional bias against defendant. Her testimony was, as noted, extremely brief and limited. The trial court did not abuse its discretion by finding that Anabella Doe's live testimony would not pose "an intolerable 'risk to the fairness of the proceedings or the reliability of the outcome.' " (*Waidla*, *supra*, 22 Cal.4th at p. 724.)

### D. *Admission of Child Abuse Accommodation Syndrome Evidence*

Defendant contends CSAAS evidence "should be inadmissible in California for all purposes" because it is "easily misapplied by a jury." Defendant asserts that the primary use of CSAAS evidence is to "bolster the complaining witness's credibility."

#### 1. *Proceedings Below*

Defendant's motions in limine included a request to exclude CSAAS evidence. Defendant asserted that expert testimony about CSAAS is insufficiently reliable, lacks probative value, and is highly prejudicial. He argued that if admitted, the CSAAS evidence should be limited to an identified "myth" specific to this case.

In response, the People argued that because "[Doe's] disclosures were piecemeal, conflicted, and substantially delayed," CSAAS testimony was "both apt and necessary to address preconceived ideas regarding such conduct and regarding the nature of sexual

17

assault disclosure." The People requested the trial court read CALCRIM No. 1193, which instructs the jury how to consider CSAAS evidence.

The trial court ruled that the expert testimony on CSAAS would be admitted, and it instructed the jury pursuant to CALCRIM No. 1193 that the CSAAS testimony was "not evidence that the defendant committed any of the crimes charged against him" and could be considered "only in deciding whether or not [Doe's] conduct was not inconsistent with the conduct of someone who has been molested and in evaluating the believability of her testimony."

2. *Analysis*

In *People v. McAlpin* (1991) 53 Cal.3d 1289, our Supreme Court did not directly address the admissibility of CSAAS testimony. However, in finding that expert opinion regarding a parent's delay in reporting child molestation was admissible, the court opined that such evidence is analogous to evidence of CSAAS. " 'Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior. [¶] The great majority of courts approve such expert rebuttal testimony.' " (*Id.* at p. 1301.)

A number of Court of Appeal decisions, including this court in *People v. Perez* (2010) 182 Cal.App.4th 231, have held that CSAAS evidence is admissible for the purpose of dispelling common misperceptions a jury may have about how children react to sexual abuse. (See, e.g., *People v. Mateo* (2016) 243 Cal.App.4th 1063, 1069; *People v. Patino* (1994) 26 Cal.App.4th 1737, 1744; *People v. Bowker* (1988) 203 Cal.App.3d 385, 393-394 (*Bowker*).) Based on these authorities, we find no error in the admission of CSAAS evidence.

18

### E.     CALCRIM No. 1193 (*CSAAS Instruction*)

Defendant challenges CALCRIM No. 1193, which tells the jury how to consider CSAAS evidence.  He contends the instruction violates due process by stating that jurors may consider CSAAS evidence in determining the credibility of the alleged victim, rather than only to explain that the alleged victim's response is not necessarily inconsistent with having been molested.

#### 1.     *Proceedings Below*

The trial court instructed the jury with CALCRIM No. 1193 as follows:  "You have heard testimony from Dr. Anthony Urquiza regarding Child Sexual Abuse Accommodation Syndrome. [¶] Dr. Urquiza's testimony about [Child] Sexual Abuse Accommodation Syndrome is not evidence that the defendant committed any of the crimes charged against him. [¶] You may consider this evidence only in deciding whether or not [Doe's] conduct was not inconsistent with the conduct of someone who has been molested and *in evaluating the believability of her testimony*."  (Italics added.)

#### 2.     *Standard of Review*

"We determine whether a jury instruction correctly states the law under the independent or de novo standard of review."  (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)  The pertinent inquiry is whether the instructions as a whole " 'fully and fairly' " set forth the applicable law.  (*Ibid.*)  Where a jury instruction is ambiguous, we assess " 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution."  (*Estelle v. McGuire* (1991) 502 U.S. 62, 72.)

#### 3.     *Analysis*

Defendant argues that by telling jurors they may use expert testimony about CSAAS "in evaluating the believability of" the complaining witness's testimony, CALCRIM No. 1193 "effectively . . . permits the jurors to consider this expert testimony

19

as supportive of the truth of the allegations," which case law prohibits. (See *Bowker*, *supra*, 203 Cal.App.3d at p. 394 ["the jury must be instructed simply and directly that the expert's testimony is not intended and should not be used to determine whether the victim's molestation claim is true"].)

CSAAS evidence is not admissible to prove that the alleged victim has in fact been sexually abused. (*Bowker*, *supra*, 203 Cal.App.3d at p. 393.) But it is admissible to rehabilitate an alleged victim's credibility when the defendant suggests that the child's conduct after the incident—i.e., recanting or a delay in reporting—is inconsistent with his or her testimony claiming molestation. (See *People v. Housley* (1992) 6 Cal.App.4th 947, 956.) Here, there was evidence that Doe engaged in conduct that might appear to be inconsistent with having been molested, including a delayed disclosure of the incident. That evidence placed Doe's credibility in issue. Dr. Urquiza testified that CSAAS is designed to dispel myths about child sexual abuse, such as that an abused child will disclose the abuse in a timely fashion. He testified that CSAAS is not used to determine whether sexual abuse actually occurred, and he offered no opinion as to the veracity of the allegations in this case. CALCRIM No. 1193 specifically informed the jury that Dr. Urquiza's testimony was "not evidence that the defendant committed any of the crimes charged against him."

In view of the foregoing, there is no reasonable likelihood that the jury understood CALCRIM No. 1193 as allowing it to use the CSAAS evidence to determine that defendant sexually abused Doe. (See *People v. Gonzales* (2017) 16 Cal.App.5th 494, 503 ["the instruction must be understood in the context of" the expert's testimony].) Rather, it is likely the jury properly understood CALCRIM No. 1193 as permitting it to use the CSAAS evidence in evaluating the believability of Doe's testimony that the molestation occurred, in light of the evidence that she engaged in conduct seemingly inconsistent with

20

the conduct of a child who had been molested. (See *id.* at p. 504.) Therefore, we reject defendant's challenge to the instruction.

## F. Fees and Fines

Relying on *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), defendant contends the trial court erroneously imposed certain fees and fines without finding he had an ability to pay.

### 1. Proceedings Below

The probation report prepared for defendant's sentencing hearing reflected that he had last worked in 2010, when he had been employed doing "general labor" for a janitorial service. Defendant had been in custody since his 2010 arrest for the Anabella Doe case. If released from custody, defendant planned to work as an electrician. He suffered from spondylolisthesis, a condition that caused him back pain and for which he took medication. The probation report recommended imposition of a $10,000 restitution fine (§ 1202.4, subd. (b)), a $30 court facility fee (§ 1465.8, subd. (a)(1)), and a $30 court operations assessment (Gov. Code, § 70373).

At the sentencing hearing held on December 10, 2018, the trial court stated it would "reduce" the restitution fine to "the minimum" and set that fine at $200.[5] The trial court also imposed a $60 court facility fee and a $60 court operations assessment.

### 2. Forfeiture

Defendant's sentencing occurred in 2018, prior to the *Dueñas* decision. Defendant argues that his failure to object at sentencing does not forfeit his appellate claim because the sentencing hearing predated *Dueñas*. This position is in accord with this court's opinions in *People v. Petri* (2020) 45 Cal.App.5th 82, 88-89 (*Petri*), where this court assumed that there was no forfeiture of a *Dueñas* argument, and *People v. Santos* (2019) 38 Cal.App.5th 923, 933 (*Santos*) and *People v. Adams* (2020) 44 Cal.App.5th 828, 831

---

[5] In 2018, the minimum restitution fine was $300. (Stats 2017, ch. 101, § 1.)

21

(*Adams*), where this court found no forfeiture of a *Dueñas* argument. Based on the reasoning stated in those cases, we will find defendant's *Dueñas* claim was not forfeited.

3. The *Dueñas* Case

The defendant in *Dueñas* was indigent, homeless, and unemployed due to a disability. She was convicted of driving with a suspended license, placed on misdemeanor probation, and ordered to pay a $150 restitution fine, a $40 court facility fee, and a $30 court operations assessment. (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1162.) The trial court found that the latter two fees were mandatory and that the restitution fine could only be waived if there were "compelling and extraordinary reasons" as defined by section 1202.4, subdivision (c), which excludes "inability to pay" as such a reason (*ibid*.).

*Dueñas* found it unconstitutional to "us[e] the criminal process to collect" fines and fees that the defendant could not pay due to her poverty. (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1160.) The court held "that due process of law requires the trial court to conduct an ability to pay hearing and ascertain a defendant's present ability to pay before it imposes court facilities and court operations assessments under Penal Code section 1465.8 and Government Code section 70373" and "that although Penal Code section 1202.4 bars consideration of a defendant's ability to pay unless the judge is considering increasing the fee over the statutory minimum, the execution of any restitution fine imposed under this statute must be stayed unless and until the trial court holds an ability to pay hearing and concludes that the defendant has the present ability to pay the restitution fine." (*Dueñas*, *supra*, at p. 1164.)

The *Dueñas* court noted that the court facility fee and the court operations assessment were intended to generate funds for courts rather than to be "punitive." (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1165.) However, that revenue goal is not furthered by imposing such fees on people who are unable to pay. (*Id*. at p. 1167.) Moreover, a person who cannot pay court fees can face additional consequences, such as collections

22

actions, which the court described as "additional punishment" that, if imposed without a finding of ability to pay, would be "fundamentally unfair." (*Id*. at p. 1168.)

The restitution fine, in contrast, *is* intended to be "additional punishment for a crime." (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1169.) However, imposition of even a minimum fine on an indigent defendant can result in disparate treatment of indigent and wealthy probationers, because someone who can pay off the restitution fine and fulfills all the other obligations of probation can often obtain dismissal of the charges pursuant to section 1203.4. (See *Dueñas*, *supra*, at p. 1170.)

*4.     Analysis*

Courts of Appeal have not agreed whether *Dueñas* was correctly decided, and the issue is pending before the California Supreme Court in *People v. Kopp* (2019) 38 Cal.App.5th 47, S257844, review granted November 13, 2019. In fact, members of this court have reached different conclusions on the issue. (See *Adams*, *supra*, 44 Cal.App.5th at p. 831 [maj. opn]; *id*. at pp. 832-833 [dis. opn. of Premo, J.]; *Petri*, *supra*, 45 Cal.App.5th at pp. 91-92 [maj. opn]; *id*. at p. 95 [dis. opn. of Premo, J.]; *Santos*, *supra*, 38 Cal.App.5th at p. 933 [maj. opn.]; *id*. at p. 935 [dis. opn. of Elia, J.].)

In the instant case, we need not decide whether *Dueñas* was correctly decided, because any error in imposing the challenged fine and fees without conducting an ability-to-pay hearing was harmless in this case.

We review federal constitutional errors under the harmless-beyond-a-reasonable-doubt test for prejudice set forth in *Chapman v. California* (1967) 386 U.S. 18, 24. Here, any error was harmless if the record demonstrates that defendant could not have established an inability to pay. (See *People v. Johnson* (2019) 35 Cal.App.5th 134, 139-140 (*Johnson*) [finding *Dueñas* error harmless under *Chapman*]; *People v. Jones* (2019) 36 Cal.App.5th 1028, 1035 (*Jones*) [same].)

23

Defendant was sentenced to a prison term of 15 years to life, with 217 days of presentence custody credit. Because defendant was convicted of a violent felony,[6] defendant will accrue "no more than 15 percent of worktime credit" pursuant to section 2933.1, subdivision (a). Thus, defendant will be required to serve at least 12 years in prison before becoming eligible for parole.

"Wages in California prisons currently range from $12 to $56 a month. [Citations.] And half of any wages earned (along with half of any deposits made into [a defendant's] trust account) are deducted to pay any outstanding restitution fine." (*Jones*, *supra*, 36 Cal.App.5th at p. 1035.) Assuming defendant earns the minimum monthly wages of $12, he can earn $1,728 in 12 years. Of that, $200 will be deducted to pay the restitution fine, leaving $1,528 to pay the $120 in court facilities fees and court operations assessments.

The record in this case shows that defendant would be able to engage in prison work. Although defendant apparently suffered from spondylolisthesis, he took medication for that condition, and he indicated that his condition would not prevent him from working as an electrician if he was released from custody. He had previously been employed doing labor.

On this record, we conclude that any error in failing to conduct an ability-to-pay hearing was harmless. (See *Johnson*, *supra*, 35 Cal.App.5th at p. 140 [defendant sentenced to eight-year prison term would have "ample time" and a "readily available source of income" from which to pay $370 in fines and fees]; *Jones*, *supra*, 36 Cal.App.5th at p. 1035 [defendant sentenced to six-year prison term would have ability to pay $300 restitution fine and $70 in assessments from prison wages]; *People v. Hennessey* (1995) 37 Cal.App.4th 1830, 1837 ["defendant's ability to obtain prison

---

[6] "Any felony punishable by death or imprisonment in the state prison for life" is a violent felony. (§ 667.5, subd. (c)(7).)

wages" is properly considered when determining whether ability to pay]; *Santos*, *supra*, 38 Cal.App.5th at p. 934 [same].)

## DISPOSITION

The judgment is affirmed.

_____

                                    Cogliati, J.*

        WE CONCUR:

_____

        Greenwood, P.J.

_____

        Elia, J.

People v. Smith
H046537

_____

    * Judge of the Santa Clara County Superior Court assigned by the Chief Justice
pursuant to article VI, section 6 of the California Constitution.